**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

JEFFREY A. HOLCOMB,

      Plaintiff,

v.                            **Civil Action No. 5:13cv144**
                                **(The Honorable Frederick P. Stamp, Jr.)**

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Jeffrey A. Holcomb ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security

("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income

("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

motions for summary judgment and has been referred to the undersigned United States Magistrate

Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §

636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

### I. Procedural History

Plaintiff filed an application for SSI and DIB on January 4, 2011, alleging disability on

December 22, 2010 (R. 152-70). The state agency denied Plaintiff's applications initially and on

reconsideration (R. 75-78). Plaintiff requested a hearing, which Administrative Law Judge Daniel

F. Cusick ("ALJ") held on May 4, 2012, and at which Plaintiff, represented by counsel, Harold

Bailey, and Eugene Czuczman, a vocational expert ("VE") testified (R. 32-74). On May 25, 2014,

the ALJ entered a decision finding Plaintiff was not disabled (R. 12-26). Plaintiff timely filed a

request for review of the ALJ's decision with the Appeals Council. On August 20, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-8).

## II. Statement of Facts

Plaintiff was born on October 3, 1959, and graduated high school (R. 40-41). Plaintiff's past work was that of a service technician for a cable company, a carpet installer, and mechanic's helper (R. 42-45).

Theresa Poling, of the Family Medical Clinic of Jane Lew, prescribed Plaintiff Enalapril and hydrochlorothiazide for hypertension on October 11, 2010 (R. 282-83).

Nurse Practitioner Nestor, of the Family Medical Clinic of Jane Lew, examined Plaintiff on December 7, 2010, for dizziness. Plaintiff stated he needed to have surgery on his right elbow, but he had "put it off" due to the cost. N.P. Nestor noted Plaintiff was positive for hypercholesterolemia, dizziness, giddiness, nausea, anxiety, depression, arthritis, and anxiety disorder (R. 279). Upon examination, Plaintiff was alert and in no acute distress. N.P. Nestor found Plaintiff's chest, lungs, heart, and abdomen were normal. He had no impairments to his recent or remote memories. Plaintiff's posture and gait were normal. Plaintiff had right elbow pain, which was alleviated by Aleve; however, Plaintiff stopped medicating with Aleve due to increased liver function. Plaintiff was prescribed Antivert for dizziness (R. 280).

A medical professional at Weston Orthopedic Sports Medicine Center injected Plaintiff's right elbow with Lidocaine and Cortisone on December 15, 2010. Plaintiff realized "excellent relief of the pain." It was noted Plaintiff had fallen on his elbow four (4) years earlier; he did "a lot of manual labor." It was also noted Plaintiff would "not be a candidate for joint replacement since he

has high physical demands on the joint" (R. 285, 354).

Dr. Sraj examined Plaintiff's right elbow on January 14, 2011, and diagnosed "cystic changes of the capitellum and the olecranon." Plaintiff was positive for anterior osteophytes over the right coronoid. Dr. Sraj noted he would consult with other surgeons about what procedure Plaintiff could have that would alleviate his symptoms (R. 351).

Dr. Sraj informed Plaintiff on January 25, 2011, that it was "best to avoid prosthetic replacement at this point," and Plaintiff should undergo a "contraction relase, inferior and posterior capsulotomy, osteophyte resection, possible OK (Outerbridge-Kashiwagi) procedure" (R. 352).

Wilda Posey, M.A., completed a Mental Status Evaluation of Plaintiff on February 15, 2011. Plaintiff's gait was stiff. Plaintiff had a valid driver's license (R. 287). Plaintiff informed Ms. Posey that he had filed "for Social Security Disability due to" his having "mental and physical disabilities and [he has had] mental problems my whole life, with anger, depression, and anxiety. The older [he got], the worse it [was] getting, and [his] physical health [was] bad." Plaintiff stated his onset date was twelve (12) years of age and it interfered with his work at age seventeen (17). Plaintiff's symptoms included poor sleep. He stated there were days he did not "want to crawl out of bed" and he stayed awake until 2:00 a.m. or 3:00 a.m. Plaintiff reported he was "mad at everybody." His depression was intermittent and was "helped" by medication. He had poor energy levels. He had crying episodes. He had experienced suicidal thoughts in the past; he had made no suicidal attempts. He had anxiety attacks. He could not sit still; he shook. He had arm and chest pain. He needed financial help. He had been treated by his family physician with medications for depression and anxiety (R. 288).

Plaintiff reported he had had elbow and knee replacement procedures; elevated liver

enzymes; right knee surgery; arthritis; low back pain; hypertension; allergies, which resulted in asthma attacks; tinnitus; and abnormal kidney placement in front of body. Plaintiff reported he medicated with Hydrochlorthizide, Paroxetine, Hydrocodone, and Enalapril. Plaintiff was not working due to pain (R. 289).

Upon examination, Ms. Posey found Plaintiff's appearance was normal; his posture was unremarkable; his gait was stiff. Plaintiff's attitude and behavior, speech, thought process, thought content, perception judgment immediate memory, and psychomotor activity were normal. Plaintiff's mood and affect were anxious and broad. His insight was poor. His recent memory was severely deficient. His remote memory was fair. His concentration was average (R. 290). Ms. Posey diagnosed depressive disorder and anxiety, not otherwise specified, and personality disorder. His prognosis was "guarded" (R. 291).

Plaintiff reported the following activities of daily living: rose at 6:00 a.m., cared for his personal hygiene daily, visited his uncle daily, visited his friend daily, spoke on the phone daily with daughter, watched television, took out the garbage, drove daily, took his wife shopping, and occasionally performed mechanical work. Plaintiff did not do household chores. He retired at 10:00 p.m. (R. 291). Ms. Posey found Plaintiff's concentration was average, but his persistence and pace were normal. He could manage funds (R. 292).

On February 28, 2011, Plaintiff was examined by a medical professional at Family Medical Clinic relative to elbow and knee replacements. Plaintiff's examination was normal. He was diagnosed with osteoarthritis and hypertension. It was noted that Plaintiff was not working and had no insurance (R. 294-95).

Philip Comer, Ph.D., completed a Mental Residual Functional Capacity Assessment of

4

Plaintiff on March 2, 2011. In the "Understanding and Memory" category, Dr. Comer found Plaintiff was not significantly limited in any area except for his ability to understand and remember detailed instructions, which was moderately limited. In the "Sustained Concentration and Persistence" category, Dr. Comer found Plaintiff was not significantly limited in his ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, and make simple work-related decisions (R. 296). Plaintiff was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods (R. 296-97). In the "Social Interaction" category, Dr. Comer found Plaintiff was not significantly limited in any area, except he was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. In the "Adaption" category, Dr. Comer found Plaintiff was not significantly limited in any area, except he was moderately limited in his ability to respond appropriately to changes in the work setting (R. 297). Dr. Comer found Plaintiff could perform "simple[,] routine[,] work like activity in work environment that has limited social interaction requirements and that can accommodate his physical limitations (R. 298).

On March 2, 2011, Dr. Comer completed a Psychiatric Review Technique of Plaintiff (R. 300). He noted Plaintiff's affective disorder was depression disorder, not otherwise specified (R. 303). His anxiety related disorder was noted as anxiety disorder, not otherwise specified (R. 305). His personality disorder was personality disorder, not otherwise specified (R. 307). Dr. Comer found

Plaintiff had mild restrictions of activities of daily living; moderate difficulties maintaining social functioning; and moderate difficulties maintaining concentration, persistence, and pace. Dr. Comer found Plaintiff had had one (1) or two (2) episodes of decompensation (R. 310).

Dr. Orvik completed a Disability Determination Examination of Plaintiff on March 6, 2011, for the West Virginia Disability Determination Service relative to his application for Social Security benefits. Plaintiff stated he was not working; he had to quit his mechanic job because of "problems with nausea and dizziness." Plaintiff had arthritic right elbow and left knee symptoms. Plaintiff had been told he needed elbow replacement surgery. He had pain in both knees, which caused difficulty walking (R. 314). Plaintiff reported he was positive for hypertension and hyperlipidemia. He had occasional chest pain due to "an old sternal fracture." Plaintiff stated he had breathing difficulties. Plaintiff's knee and elbows symptoms were exacerbated by his standing and lifting. Plaintiff stated his symptoms were worsening. Plaintiff reported pain in both knees, right elbow, neck, and back. Plaintiff described his pain as aching and constant. Plaintiff stated his pain reached an eight (8) on a scale of one to ten (1-10). Plaintiff medicated his pain with Hydrocodone, as needed. Plaintiff also medicated with Enalapril, Naproxen, and Hydrochlorothiazide (R. 315).

Dr. Orvik found Plaintiff's ears, nose, throat, respiratory system, cardiovascular system, and gastrointestinal system were normal (R. 315). Plaintiff had experienced occasional headaches and kidney stones. Upon examination, Dr. Orvik found Plaintiff's neck, chest, lungs, heart, abdomen, and extremities were normal (R. 316-17). Plaintiff stated he had right hand numbness. His muscle strength was 5/5 in extremities, bilaterally. His deep tendon reflexes were 1+ in his knees and ankles. Plaintiff's cranial nerves were intact. His supine straight leg raising test was positive on the right and at 80 degrees with back pain. Plaintiff's sitting straight leg raising test was normal. He had no muscular atrophy. As to Plaintiff's joints and spine examinations, Dr. Orvik found they were

6

normal except for his right elbow motion and extension and knee flexion and extension. Plaintiff's stance was normal. His gait was positive for a slight left limp. Plaintiff did not use assistive devices. He was unable to tandem walk "quite well." He could walk on his heels and "some on his toes." Plaintiff could bend to 90 degrees and do a full squat "with moderate difficulty." Plaintiff had no difficulty getting in and out of the chair and on and off of the examining table. Plaintiff reported he could dress and undress himself "without problem." He could pick up objects "well." Dr. Orvik diagnosed arthritis of the right elbow and in both knees; hypertension; hyperlipidemia; and back pain consistent with chronic lumbosacral strain (R. 317). Dr. Orvik noted Plaintiff's treatment for his "various problems appear[ed] to be probably appropriate." Dr. Orvik's prognosis was "guarded" as to Plaintiff's right elbow and left knee because Plaintiff had been told that he needs right elbow joint replacement and may need a left knee replacement. Dr. Orvik reiterated his finding that Plaintiff's right elbow did not have full extension and had decreased range of motion (R. 318).

Plaintiff informed Dr. Orvik that he could sit for "about two hours at a time and then has to get up because of back pain." Plaintiff stated he could stand between one-half (½) and one (1) hour before he needed to move due to back pain. Plaintiff stated he could walk "about 100 yards" before he had to stop due to knee pain. Plaintiff stated his lifting was limited due to his elbow. He could travel in a vehicle. Dr. Orvik found "the possibility that he may be able to return to work" after his elbow replacement surgery" was a "consideration" (R. 318).

Dr. Gomez, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on March 10, 2011. Dr. Gomez found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand for a total of six (6) hours in and eight (8) hour workday; sit for a total of six (6) hours in an eight (8) hour workday; and

push/pull unlimited (R. 322). Dr. Gomez found Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. Dr. Gomez found Plaintiff could never climb ladders, ropes, or scaffolds or crawl (R. 323). Due to Plaintiff's "permanent limitation of the right elbow," Dr. Gomez found Plaintiff was limited in reaching in all directions, including overhead. Dr. Gomez found, however, that Plaintiff was not limited in his ability to handle, finger, and feel. Dr. Gomez found Plaintiff had no visual limitations (R. 324). Plaintiff had no communication limitations. Dr. Gomez found Plaintiff's exposure to extreme cold and heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation were unlimited. Plaintiff should avoid concentrated exposure to vibrations and hazards (R. 325).

On May 10, 2011, Dr. Reddy reviewed Dr. Orvik's March 10, 2011, Physical Residual Functional Capacity Assessment and agreed with same (R. 329).

On May 20, 2011, Paula J. Bickham, Ph.D., reviewed Dr. Comer's March 2, 2011, Mental Residual Functional Capacity Assessment and Psychiatric Review Technique of Plaintiff and affirmed same (R. 330).

At Dr. Scharf's September 29, 2011, Psychiatric Diagnostic Interview of Plaintiff, Dr. Scharf noted Plaintiff was disabled due to "elbow replacement." Dr. Scharf noted Plaintiff had severe pain in his neck, back, and arms. Dr. Scharf also noted Plaintiff had been unable to work since December, 2010. Plaintiff was having "transient" suicidal thoughts due to pain (R. 333). Dr. Scharf found Plaintiff was moody and irritable. His sleep and appetite were good. Plaintiff was restless and he became angry easily. Plaintiff reported racing thoughts and difficulty staying focused. Plaintiff had mood swings and was easily agitated. Plaintiff had no hallucinations or paranoia. Dr. Scharf diagnosed bipolar affective disorder, mixed; pain syndrome; personality disorder, not otherwise

specified; and severe pain. Dr. Scharf prescribed Depakote (R. 335).

On October 6, 2011, Plaintiff had an Initial/Review Assessment with Jessica Griffin at the United Summit Center ("USC"). Plaintiff was referred there by St. Joseph Hospital for suicidal ideation. He reported that he was seeking treatment for "symptoms of depression, anxiety, panic, agitation, and hostility." He also reported that he suffered from chronic pain from working in "hard labor all of his life" and that he was hospitalized for "suicidal ideations as a result of his pain" (R. 361). Plaintiff reported that he has problems with aggression; that he has a bad temper and can be hostile and argumentative; and "'doesn't take anything from anyone'" (R. 362).

Upon examination, Ms. Griffin noted that Plaintiff was oriented and had a depressed mood and flat affect. Plaintiff was willing to communicate, and his speech was coherent. Ms. Griffin noted that Plaintiff was having difficulty sleeping and relaxing. She diagnosed bipolar I disorder, most recent episode depressed moderate, and generalized anxiety disorder (R. 363). She also assigned him a Global Assessment of Functioning ("GAF") score of 55. Plaintiff was to receive "TCM and individual therapy" (R. 364).

Plaintiff presented to Dr. Scharf on October 18, 2011, for a pharmacological management checkup. Dr. Scharf increased Plaintiff's dosage of Depakote. Plaintiff reported he was sleeping better, he was still dreaming, he had mood swings (R. 332).

Plaintiff presented to Dr. Sraj on December 12, 2011, for right elbow pain. Plaintiff stated he had more pain than he had eleven (11) months earlier, but he had no new injury. Dr. Sraj found Plaintiff had no sensory changes and no radiculopathy. He had neck pain. Plaintiff reported no difficulty with rotation; Dr. Sraj observed Plaintiff "lag[ged] in extension." Plaintiff reported he medicated with Aleve and Tramadol, but neither medication was alleviating his pain. Dr. Sraj found

no swelling or tenderness. Plaintiff's right elbow range of motion flexion was 40 degrees; all other ranges of motion were normal. Plaintiff had intact strength; his sensation was intact. His profusion was intact, distally. Plaintiff's elbow was stable in valgus, varus, and posterolaterally. Dr. Sraj found right elbow osterarthritis. Plaintiff medicated with Enalapril (R. 347). Dr. Sraj recommended "elbow arthoscpy (sic), possible open, osteoplasty and exostectomy" (R. 348).

Plaintiff saw Nurse Practitioner ("NP") Williams at USC for a psychiatric intake evaluation on January 4, 2012. Plaintiff's chief complaint was "'[a]nger and depression, with a mental breakdown.'" Plaintiff reported that he hadn't "felt right in a long time." His current medications included Sertraline, Paxil, and Ativan; Plaintiff had failed on Depakote because it "didn't make him feel right" (R. 367). Upon examination, Plaintiff was alert and oriented as to person, place, time and situation. He described his mood as "'down and out.'" Plaintiff had a congruent affect and denied hallucinations, psychosis, and current suicidal or homicidal ideation. Plaintiff was cooperative and had fair insight and judgment. NP Williams noted that both his remote and recent memory appeared to be intact. Her impression was for bipolar I disorder, most recent episode depressed, moderate; generalized anxiety disorder; hypertension; and arthritis. She assigned a GAF of 55. NP Williams instructed Plaintiff to continue therapy and stop taking Zoloft. She prescribed him Wellbutrin and Paxil (R. 368). NP Williams advised Plaintiff that if the changes in his medication did not "do the trick," she would stop the Wellbutrin and Paxil, start him on Viibryd, and renew his Ativan. Plaintiff was to return in one month (R. 369).

Plaintiff underwent a arthroscopic chondroplasty and osteoplasty in the posterior compartment of his right elbow on January 19, 2012. Dr. Sraj's preoperative and postoperative diagnoses were for arthritis. Plaintiff tolerated the procedure well and was in good condition (R.

356-57). Plaintiff's right elbow x-ray showed postsurgical and arthritic changes (R. 355).

Plaintiff presented to Dr. Sraj on February 2, 2012, for a follow-up examination of his right elbow post January 19, 2012, arthroscopic chondroplasty. Plaintiff's right elbow had 30-75 range of motion, "active flex and ext," and "healed"wound. Dr. Sraj diagnosed localized osteoarthrosis in Plaintiff's upper arm and right elbow, and joint stiffness. Plaintiff was instructed to use a hinged brace and return in two (2) weeks (R. 344).

Plaintiff presented to Dr. Sraj on February 17, 2012, for a follow-up examination of his right elbow. Plaintiff reported he medicated with Enalapril, hydrochlorothiazide, Paroxetine, Lorazepam, Cyclobenzaprine, Naproxen, and Tramadol. Plaintiff reported his elbow pain was "a lot better" and that he had "achieved 20-110 in motion" at physical therapy. Upon examination, Plaintiff left elbow was normal; his right elbow had a "healed" wound, active "flex and ext," and 30-110 range of motion. Dr. Sraj diagnosed osteoarthrosis in Plaintiff's upper arm and right elbow, and joint stiffness. Plaintiff was instructed to continue participating in physical therapy and return in four (4) weeks (R. 342).

On March 29, 2012, Plaintiff saw Dr. Elizabeth Kane "to establish care . . . because he need[ed] a DHHR form filled out." Plaintiff reported that had worked in "physical labor" for several years and that he had not been able to work for the past year "due to nausea and dizziness caused by pain from arthritis." He spent most of his days sitting at home. Dr. Kane noted that Plaintiff's medical history included "heart murmur, high blood pressure, nausea, arthritis/joint pain, kidney stones . . ., depression/anxiety/bipolar" (R. 387). Upon examination, Dr. Kane found that Plaintiff was alert and oriented and was in no acute distress. His HEENT, cardiovascular, and respiratory systems were all normal. Plaintiff had "[n]o pain to palpation over bilateral knees or lower back."

His gait was "stiff at knees" and he walked "cautiously." Dr. Kane assessed generalized osteoarthritis, involving multiple sites (R. 388).

That same day, Dr. Kane completed a "General Physical (Adults)" form for the West Virginia DHHR Medical Review Team. In that form, she noted that Plaintiff stated that he could not work because of pain from "labor work" in his back and multiple joints (R. 378). Plaintiff's gait was "with legs stiff @ knees." As to Plaintiff's orthopedics, Dr. Kane determined that he was "cautious on bilateral knees." Plaintiff had pain in his bilateral knees, which became worse with standing and walking. Dr. Kane's major diagnosis was for osteoarthritis and borderline elevated blood pressure; her minor diagnosis was for depression/anxiety/bipolar disorder. She opined that Plaintiff was unable to work full-time at a customary occupation or like work (R. 379). Dr. Kane further opined that Plaintiff was unable to perform other full-time work and that he should avoid work situations involving "ambulatory positions, positions w/ lifting/bending, positions [illegible] all day." She expected Plaintiff's condition to be "progressive." In summary, Dr. Kane stated that Plaintiff had "significant pain in all extremities and back due to . . . arthritis that limit [sic] his mobility in day to day activities." Plaintiff "reports limitation in working for years" (R. 380).

Plaintiff had a 90-day review at USC on April 3, 2012. Plaintiff reported that things were "going well" and that his depression, panic, and agitation were "stabilized at a mild level." He stated that participating in therapy had "given him a great deal of insight" and was "helping him cope with his symptoms" (R. 375). Plaintiff further noted that his hostility had "reduced" and was "stabilized at a mild level" (R. 376).

On April 18, 2012, NP Williams completed a Medical Source Statement (Mental) concerning Plaintiff. NP Williams noted that Plaintiff had mild restriction in his ability to remember locations

and work-like procedures and had moderately severe restrictions in his ability to understand and remember detailed instructions. Plaintiff also was mildly restricted in his abilities to sustain ordinary routine without special supervision and make simple work-related decisions. He was moderately restricted in his abilities to carry out very short and simple instructions, carry out detailed instructions, and maintain attention and concentration for extended periods of time. NP Williams found that Plaintiff had moderately severe restrictions in his ability to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without any unreasonable number and length of rest periods. She also determined that Plaintiff was mildly to moderately restricted in his ability to work in coordination with or proximity to others without being distracted by them and had moderate to moderately severe restrictions in his ability to perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances (R. 390).

NP Williams also found that Plaintiff was mildly limited in his abilities to interact appropriately with the general public, ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. He had moderate to moderately severe restrictions in his ability to accept instructions and respond appropriately to criticism from supervisors. As to that finding, NP Williams noted that Plaintiff was "easily agitated by other people." As to adaptation, Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. He was severely limited in his ability to travel in unfamiliar places or use public transportation, and NP Williams noted that

Plaintiff was "likely to get angry–frustrated." NP Williams diagnosed Plaintiff with bipolar affective disorder. As to history, she noted that Plaintiff had been treated and evaluated by mental health providers, all of whom agreed he had anxiety and depression. Her records indicated "bipolar affective d/o with predominantly depressed mood, assoc w/change and impairment in functioning." Her clinical observations of Plaintiff indicated "difficulty concentrating, easily fatigued, irritability, easily angered, increased muscle tension, sleep disturbance, trembling, and heightened startle reflex." Plaintiff also experienced "racing thoughts and many times feels like a failure @ life" (R. 391).

NP Williams opined that Plaintiff's impairments lasted or could be expected to last twelve (12) months. His psychological/psychiatric conditions could possibly be expected to exacerbate his pain because, as NP Williams found, he had muscle tension from his anxiety, which would increase with stress (R. 392). When asked to identify the medical and clinical findings that supported her assessment, NP Williams stated, "See notes." She further opined that Plaintiff's impairments were likely to produce "good days" and "bad days" and that he would likely be absent from work as a result of his impairments more than four times a month, "or more likely 1-2 x a week" (R. 393).

Administrative Hearing

At the hearing before the ALJ, Plaintiff testified that he last worked in December 2010, at Turner's, Inc. in Weston, West Virginia. He stopped working because of a "lot of problems" with his arm and because he couldn't stand the pain. According to Plaintiff, his pain made him "nauseous and dizzy" to the point of almost passing out (R. 43).

Plaintiff first worked for a cable television company, TCI of West Virginia, as a service technician (R. 43). He frequently carried an 80-pound ladder on his shoulder and had to help lift rolls of cable onto a trailer. Plaintiff had to lift approximately 100 pounds and was on his feet

approximately six (6) out of eight (8) hours a day (R. 44). He then worked for his brother's carpet business, where he would have to carry at least 200 pounds in order to assist in lifting and carrying a roll of carpet. Plaintiff last worked as a mechanic's helper at Turner's, Inc. (R. 45). At that job, he helped with changing parts, oil changes, tire work, and whatever else the mechanics needed done. He would have to lift up to 80 pounds and was on his feet for seven (7) hours during an eight (8)-hour day (R. 46).

Plaintiff testified that if he got "worked up," his face turned red, he got dizzy, and he got a headache. He noted that it was a "daily struggle" for him to keep himself "under control." Plaintiff's headaches usually lasted for one (1) to two (2) hours. He rated the pain at "about an eight." Plaintiff took medication for his headaches, but was not supposed to take "any more than absolutely necessary" because of problems with high liver enzymes (R. 48). His medications made him sleepy, drowsy, and feeling like he had no energy. Plaintiff's high blood pressure problems were aggravated when something "tick[ed] him off" or someone was "argumentative" or a "smart aleck." To help his blood pressure, Plaintiff rested and took medication (R. 49).

Plaintiff had surgery on his right elbow. He had "more motion" in that elbow than before, but the pain was still there. Plaintiff was unable to lift or do very much with his elbow. He tried to use his left hand as much as possible. After the surgery, Plaintiff's pain was "[m]aybe ten percent less" (R. 49). The pain was aggravated if Plaintiff opened or closed his elbow all the way, and his pain was approximately a seven (7) on a ten-point scale. Plaintiff's pain was constant. He took three pills for his elbow, which caused dry mouth (R. 50). "Heavy pain killers" helped his elbow pain, and movement aggravated it (R. 51).

Plaintiff's knees "kick[ed] out" when he walked. He had fallen between twelve (12) and

15

twenty (20) times in the past year and a half (R. 51). He got relief from his knee pain when he was asleep and experienced constant pain when awake. Plaintiff rated his knee pain as an eight (8). Walking and standing up aggravated the pain; lying down and taking medication helped the pain.

As to his lower back, Plaintiff testified that he was unable to do any "bending over work" and that his pain would cause him to wake up. Plaintiff's back pain came and went. His back bothered him "half a day every day" (R. 53). He rated his back pain as an eight (8) out of ten (10). Plaintiff's back pain was aggravated by bending over and lifting, and it was helped by lying down for a few hours and medication. Plaintiff also experienced tremors (R. 54). He was unable to hold much in his hands because he would drop things, such as dishes. Plaintiff dropped something about every other day. He took medication for the tremors, and the medication made him sleepy (R. 55). His tremors were aggravated by stress and his pain, and sleeping and being by himself helped them (R. 56). Plaintiff also had problems with his neck; it was stiff and "often crack[ed]." His neck pain was constant and rated at about a seven (7) out of ten (10). The medication he took for his neck pain caused him to sleep. The pain was aggravated when Plaintiff turned his head a certain way. Plaintiff testified that heat "seem[ed] to help" and that he also would lie down to help the pain (R. 57).

Plaintiff's depression, bipolar disorder, and anxiety caused him to "tear[] stuff up, want[] to fight, [and] caus[e] [him] and [his] wife a lot of problems." Plaintiff thought he had "the Holcomb temper." When he got back to "almost normal" Plaintiff "fe[lt] like an ass." Plaintiff testified that he didn't "mean to do it" but had "no control over it" (R. 58).

Plaintiff testified that he would walk approximately 50 to 75 feet before he had to stop and sit down. He thought he could stand for 20 to 30 minutes at a time before he became "real stiff." After standing for 20 to 30 minutes, Plaintiff had to sit or lie down (R. 59). He had to sit or lie down

for about half an hour before he could stand again. Plaintiff could sit for half an hour to one hour before having to change position. He would stand or recline in his chair for about 20 to 30 minutes before sitting again. Plaintiff was unable to lift anything with his right hand but could lift 40 pounds with his left hand. He was right-handed. Plaintiff was unable to climb steps (R. 60).

Plaintiff only communicated with his wife and daughter. He would ride in the car to "wherever" his wife was going. Plaintiff watched television and enjoyed sports, the news, and sitcoms (R. 61). Plaintiff did not participate in any outdoor activities. He was able to dress himself and could "slowly" get in and out of the shower by himself. A friend drove him to the hearing; they stopped once so Plaintiff could get out and stretch (R. 62). Plaintiff did not help with shopping, doing the dishes, laundry, vacuuming, housework, or yard/garden work. He "very seldom" took the garbage out. Plaintiff spent most of a typical day in his home watching television. Two to three days a week, his depression would hit and he would lay back down and sleep until it passed. He would also pet his cat on a typical day (R. 63).

The ALJ asked the VE the following hypothetical question:

I'd like you to consider an individual of Claimant's age, education and vocational background capable of performing light work where they can lift up to 20 pounds occasionally, lift or carry ten pounds frequently, can stand or walk for approximately six hours in an eight-hour work day, and sit for approximately six hours in an eight-hour work day. This individual could never climb ladders, ropes or scaffolds, and could never crawl. This individual could occasionally climb ramps or stairs, could occasionally balance, stoop, kneel, crouch and crawl. This individual could frequently reach with his right arm and could frequently reach overhead with his right arm. This individual would have to avoid concentrated exposure to excessive vibration and concentrated exposure to workplace hazards such as unprotected dangerous machinery and unprotected heights. This individual, their work would be limited to simple routine and repetitive tasks involving only simple work-related decisions with few, if any, workplace changes. They could only occasionally interact with the public, and occasionally interact with co-workers with no tandem tasks, and could only have occasionally supervision. Could this individual perform any of the Claimant's past work?

The VE responded that such an individual could not perform Plaintiff's past work, but could perform the jobs of collator operator, with 55,000 jobs nationally and 115 jobs regionally; folding machine operator, with 73,000 jobs nationally and 350 jobs regionally; and inserting machine operator, with 82,000 jobs nationally and 375 jobs regionally (R 66-67). The same individual could perform the same jobs even with no limitation on interaction with the public (R. 67).

> The ALJ then asked the VE:
>
> Then the same individual with the exact same limitations, but this one reduced to sedentary work, lifting up to ten pounds occasionally, stand or walk for approximately two hours in an eight-hour work day, and sit for approximately six hours in an eight-hour work day with normal breaks.
>
> Is there work available in the region or the national economy which such an individual could perform?

The VE responded that such an individual could perform the jobs of type copy examiner, with 72,500 jobs nationally and 375 jobs regionally; laminator, with 73,025 jobs nationally and 425 jobs regionally; and final assembler, with 45,200 jobs nationally and 125 jobs regionally (R. 67-68). An individual with the same limitations but who could only occasionally interact with the public could perform the same jobs (R. 68).

> The ALJ then asked:
>
> The same individual exactly as in the last hypothetical but, in addition, this individual can only walk to, walk for 50 to 75 feet and then would have to sit for ten minutes, could stand for 20 to 30 minutes but would have to at least fidget and move around some while they were doing that then would have to sit or lie down for 30 minutes, could sit for 30 to 60 minutes and then would need to either stand or recline for about 20 or 30 minutes. This individual would not be able to climb stairs at all. Is there work available in the region or the national economy which such an individual could perform?

The VE responded that such an individual could still perform the jobs of type copy examiner, laminator, and final assembler (R. 68-69).

<u>Evidence Submitted to the Court</u>

Plaintiff submitted a report, dated August 16, 2012, of a consultative evaluation performed by Rod McCullough, MA, on August 15, 2012. This report was considered by the Appeals Council but was not made part of the record (R. 2). During that evaluation, Plaintiff indicated that "he has always had difficulty controlling his anger" and has become involved in physical altercations. According to Plaintiff, "the death of his mother had a significant impact on his emotional status." Plaintiff reported "difficulty with sleep" and "diminished" energy levels. Plaintiff reported being "often agitated and easily angered." He indicated that he is "more prone to verbal aggression, unless challenged." Mr. McCullough administered the MCMI-III to Plaintiff. (Docket No. 13 at 2.)

After administering the MCMI-III to Plaintiff, Mr. McCullough opined that Plaintiff displayed the following personality scales: avoidant, passive-aggressive (negativistic), schizoid, borderline, schizotypal, paranoid, and depressive. (<u>Id.</u> at 4-5.) Mr. McCullough assessed bipolar disorder NOS; dysthymic; major depressive disorder, mild, recurrent; posttraumatic stress disorder; pain disorder associated with a general medical condition; personality disorder, not otherwise specified; reported arthritic pain; and other psychosocial and environmental problems. (<u>Id.</u> at 7.) He noted that Plaintiff's historical information "is suggestive of the fact that [Plaintiff] demonstrates rapid changes in mood and behavior, going from calm one moment to being angry the next, which can give the air of a bipolar-type swing in mood." (<u>Id.</u> at 6.) As to Plaintiff's physical pain, Mr. McCullough opined that "[i]t is possible that he may misinterpret some of the physical pain, but any misinterpretation is not intentional and is likely the result of an underlying social avoidance tendency." (<u>Id.</u>) Overall, he found that it "would not be uncommon for [Plaintiff] to exhibit heightened symptoms of anxiety, hyper-arousal, hyper-vigilance, irritability, aggression, and

symptoms indicative of anxiety syndrome-bipolar-type event should he be faced with an environmental event to which he cannot escape or avoid." (Id.)

Mr. McCullough opined that Plaintiff's "resulting impairment in functioning is quite severe and occupationally limiting to the point of causing him to be unable to function in the competitive work environment." (Id.) He endorsed Plaintiff's impairment "to the severe nature in his ability to handle changes in the work setting; severe limitation in maintaining concentration, persistence and pace; severe in socially being able to daily maintain any reliable or useful relationship with supervisors or co-workers; severe in making most any type of work adjustment and, as a result, I feel he will readily or regularly decompensates [sic] on the job." (Id. at 7-8.) Such compensation "would be and has been characterized by a range of conduct from simply not reporting to work or leaving the job site or undue fits of anger, bouts of depression, loss of control with episodes of verbal abuse and perhaps physical assaults." (Id. at 8.)

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Cusick made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since December 22, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: hypertension; osteoarthritis, right elbow, status post surgery; osteoarthritis, knees; lumbosacral strain/low back pain; bipolar/depression; anxiety; and personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(D), 404.1525, 404.1526, 416.920(D), 416.925 AND 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he must perform work limited to simple, routine, and repetitive tasks; involving only simple, work-related decisions with few, if any, work place changes, occasional interaction with co-workers (no tandem tasks), supervisor(s), or the general public. The claimant must work in a controlled environment free of concentrated exposure to excessive vibration, and exposure to workplace hazards such as unprotected machinery and heights, requiring no more than frequent reaching or overhead reaching; occasional balancing, stooping, kneeling, crouching, climbing of ramps or stairs, and no crawling or climbing of ladders, ropes or scaffolds.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 3, 1959 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR, Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 22, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1. Because the ALJ failed to address Plaintiff's pain disorder impairment, this Court must remand so the Commissioner can consider the effects of Plaintiff's pain disorder singly and in combination with all of Plaintiff's impairments.

2. Because a nurse practitioner provided an opinion as to Plaintiff's limitations, the Court must find the ALJ's classification of the nurse practitioner as a non-acceptable medical source was an invalid basis on which to discount the nurse practitioner's opinion.

3. Because the ALJ failed to address the evidence that supported the nurse practitioner's opinion and was contradictory to the ALJ's ultimate conclusion

22

that the nurse practitioner's opinion was not supported then this Court must remand the case to allow the ALJ to address the contrary evidence.

(Plaintiff's Brief at 7-15.)

The Commissioner contends:

1.  Substantial evidence supports the ALJ's residual functional capacity assessment.

(Defendant's Brief at 11-15.)

## D. Pain Disorder

Plaintiff first alleges that the ALJ erred by not addressing his pain disorder "either singly or in combination with [his] other impairments." (Plaintiff's Brief at 7.) Specifically Plaintiff argues that the ALJ failed to address whether or not his pain disorder was a severe or non-severe impairment that caused him to experience limitations. (Id. at 9.) According to Plaintiff, Dr. Scharf, his treating psychologist, diagnosed him with a pain disorder; Wilda Posey, MA, noted problems with pain; and Rod McCullough, MA, diagnosed a severe pain disorder. (Id. at 7.) Plaintiff further states that the ALJ did not cure his error at Step Two of the sequential evaluation because he did not address the pain disorder at Step Four when determining Plaintiff's RFC.[1] (Id. at 9.)

At Step Two of the sequential evaluation, Plaintiff bore the burden of producing proof that he had a severe impairment. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983). However, a mere diagnosis of a condition is insufficient to prove disability; instead, there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). "The severity standard is a slight one in this Circuit." Stemple v. Astrue, 475 F. Supp. 2d 527, 536 (D. Md. 2007).

_____

[1]The Commissioner did not address Plaintiff's contention regarding his pain disorder in her brief.

An impairment is not severe "only if it is a *slight abnormality* which has such a *minimal* effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal citation and quotation omitted) (emphasis in original); see also 20 C.F.R. § 404.1521(a) ("An impairment . . . is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

Furthermore, under the Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

On February 15, 2011, Wilda Posey, MA, completed a consultative examination of Plaintiff.

Plaintiff reported that his pain keeps him awake and that he has "'a lot of pain.'" (R. at 288.) He told Ms. Posey that he was not working "due to physical pain." (R. at 289.) Nevertheless, Dr. Posey never diagnosed Plaintiff with a pain disorder, nor did she opine as to any limitations on Plaintiff's ability to work.

On September 29, 2011, Dr. Scharf saw Plaintiff for a psychiatric diagnostic interview. Dr. Scharf noted that Plaintiff had problems with severe pain in his neck, back, and arms. (R. at 333.) He diagnosed Plaintiff with a "pain syndrome." (R. at 335.) However, at no time did Dr. Scharf find that Plaintiff's "pain syndrome" imposed limitations on Plaintiff's ability to work.

Plaintiff also notes in his brief that the records of USC demonstrate his problems with pain. (Plaintiff's Brief at 7.) At his Initial/Review Assessment, Plaintiff complained of suffering from "chronic pain from working in hard labor all of his life." (R. at 361.) He was "hospitalized for suicidal ideations as a result of his pain." (Id.) Ms. Griffin, who conducted the initial assessment, noted that Plaintiff had seen a physician regarding the severity of his pain, and that Plaintiff had made comments that "if something does not happen he would fix the pain himself." (Id. at 362.) On January 4, 2012, NP Williams also noted that Plaintiff suffered from chronic pain from working in labor-intensive jobs his "whole life." (Id. at 367.) NP Williams stated that Plaintiff quit working at Turner's, Inc. because of the "pain in his joints." (Id. at 368.) Furthermore, in her Medical Source Statement (Mental) of Plaintiff dated April 18, 2012, NP Williams opined that Plaintiff's muscle tension would increase with stress and "major episodes," "causing more pain." (Id. at 392.) Nevertheless, the records from USC are silent as to a diagnosis of a pain disorder.

Plaintiff cites Boyd v. Astrue, No. 2:09 CV 67, 2010 WL 2197659 (N.D. W. Va. May 28, 2010), for his contention that the ALJ erred by making "no analysis as to whether the pain disorder

25

was a severe impairment or not." (Plaintiff's Brief at 9.) In <u>Boyd</u>, the late United States District Judge Robert E. Maxwell determined that remand was required because the ALJ had failed to "consider[] any limitations and restrictions imposed by all of the Plaintiff's impairments, even those he found not to be severe, such as her sleep apnea." <u>Id.</u> at *4. The plaintiff in <u>Boyd</u> was diagnosed with "significant obstructive sleep apnea" after a diagnostic sleep study was performed. <u>Id.</u> at *3. Her doctor advised that she not drive or use machinery "while feeling sleepy" and that she not use "sedatives, hypnotics or alcoholic beverages while her obstructive sleep apnea was untreated." <u>Id.</u> Based upon this medical evidence, Judge Maxwell determined that the ALJ's RFC assessment that the plaintiff could perform a full range of light work was "suspect" because he had not considered the restrictions and limitations caused by her sleep apnea. <u>Id.</u> at *4.

The undersigned agrees with Plaintiff that in <u>Boyd</u>, the ALJ erred by not considering the effects of the claimant's sleep apnea. However, Plaintiff ignores that the claimant in <u>Boyd</u> also alleged that the ALJ erred by not addressing her elbow injury as an impairment. <u>Id.</u> at *3. However, Judge Maxwell noted that the claimant had not submitted any medical evidence supporting her claim that her elbow injury caused impairment that affected her ability to work. <u>Id.</u> at *4-5. Given that, he determined that the ALJ did not err by not addressing the claimant's elbow injury as an impairment in his decision. <u>Id.</u> at *5.

The undersigned finds that the evidence contained in the record before the ALJ as to Plaintiff's alleged pain disorder is substantially similar to the situation regarding the elbow injury alleged by the claimant in <u>Boyd</u>. None of the evidence discussed above asserts that Plaintiff's pain disorder caused him restrictions or limitations that affected his ability to work. Accordingly, the undersigned finds that as of the time of the ALJ"s decision, Plaintiff failed to meet his burden of

demonstrating that his alleged pain disorder was an impairment that the ALJ needed to include in his discussion at Steps Two and Four of the sequential evaluation.  See Hunter, 993 F.2d at 35; Gross, 785 F.2d at 1165; SSR 96-8p, at *1.

In his brief, Plaintiff also asserted that Rod McCullough, MA, diagnosed him with a severe pain disorder.  (Plaintiff's Brief at 7.)  Mr. McCullough conducted his consultative examination of Plaintiff on August 15, 2012.  (Docket No. 13 at 1.)  In a footnote in his brief, Plaintiff states:

> Mr. McCullough's report clearly relates to the adjudicated period as he reviewed and assessed records from the adjudicated period and, in fact, supported and endorsed the opinions of Dr. Scharff [sic] and JuneMarie Williams, FNP, which were both formulated during the adjudicated period.  The Appeals Council merely looked at the date of newly submitted evidence and declared that the new evidence relates to a time period after the ALJ decision.  The contents of Mr. McCullough's report shows otherwise.

(Plaintiff's Brief at 7.)  The undersigned construes Plaintiff's footnote as an assertion that the Appeals Council erred by failing to remand his case for consideration of Mr. McCullough's report. Defendant asserts that Mr. McCullough's report does not concern the period of time before the ALJ's decision and is cumulative.  (Defendant's Brief at 14-15.)

In Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council must consider additional evidence that was not submitted to the ALJ if the evidence is (1) new, (2) material, and (3) relates to the period on or before the date of the ALJ's decision.  "New evidence is evidence which is not duplicable or cumulative.  Evidence is 'material' if there is a reasonable possibility that it would have changed the outcome."  Id. at 96.  Evidence relates to the period on or before the date of the ALJ's decision if it provides evidence of a plaintiff's impairments at the time of the decision.  See Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005).

In the report submitted to the Appeals Council, Mr. McCullough diagnosed Plaintiff with, inter alia, a pain disorder associated with a general medical condition. (Docket No. 13 at 7.) He further opined that "[i]t is possible that [Plaintiff] may misinterpret some of the physical pain, but any misinterpretation is not intentional and is likely the result of an underlying social avoidance tendency." (Id. at 6.) Mr. McCullough endorsed Dr. Scharf's assessment of a pain syndrome. (See id. at 7.) He further "endorse[d] impairment . . . to the severe nature in [Plaintiff's] ability to handle changes in the work setting; severe limitation in maintaining concentration, persistence and pace; severe in socially being able to daily maintain any reliable or useful relationship with supervisors or co-workers; severe in making most any type of work adjustment and, as a result, I feel he readily or regularly decompensates on the job." (Id. at 7-8.) Mr. McCullough stated that such decompensation "would be and has been characterized by a range of conduct from simply not reporting to work or leaving the job site or undue fits of anger, bouts of depression, loss of control with episodes of verbal abuse and perhaps physical assaults." (Id. at 8.)

A report may be new evidence even when the information contained in the report is similar to information already introduced. See Venters v. Astrue, No. TMD 08-1736, 2010 WL 481246, at *3 (D. Md. Feb. 4, 2010). Mr. McCullough's findings directly contradict the findings of the ALJ. The ALJ found that Plaintiff had the RFC to "perform work limited to simple, routine, and repetitive tasks; involving only simple, work-related decisions with few, if any work place changes, occasional interaction with co-workers (no tandem tasks), supervisor(s), or the general public." (R. at 16.) Mr. McCullough, however, endorsed Plaintiff's impairment "to the severe nature in his ability to handle changes in the work setting; severe limitation in maintaining concentration, persistence and pace; severe in socially being able to daily maintain any reliable or useful relationship with supervisors or

co-workers; severe in making most any type of work adjustment and, as a result, I feel he will readily or regularly decompensates [sic] on the job." (Docket No. 13 at 7-8.) Although Dr. Scharf also diagnosed Plaintiff with a pain syndrome, Mr. McCullough's report includes additional limitations. Accordingly, because the report contradicts previous findings, it is neither duplicative nor cumulative. As such, the undersigned finds that it is new evidence under Wilkins.

Mr. McCullough's report is also material. The ALJ found that Plaintiff was only partially credible and "accordingly did not fully accept [his] subjective statements concerning his symptoms and limitations." Boggs v. Astrue, No. 2:12-CV-25, 2012 WL 5494566, at *4 (N.D. W. Va. Nov. 13, 2012). The ALJ also did not discuss Plaintiff's pain disorder as either a severe or non-severe impairment at Steps Two and Four of the sequential evaluation. Plaintiff's case is a Step Five case, where the ALJ determined that he could not perform his past relevant work but that he was not disabled because he retained the capacity for work that exists in significant numbers in the national economy. (R. at 25.) The jobs provided by the VE are based on the following RFC:

> [L]ight work . . . limited to simple, routine, and repetitive tasks; involving only simple, work-related decisions with few, if any, work places changes, occasional interaction with co-workers (no tandem tasks), supervisor(s), or the general public. The claimant must work in a controlled environment free of concentrated exposure to excessive vibration, and exposure to workplace hazards such as unprotected machinery and heights, requiring no more than frequent reaching or overhead reaching; occasional balancing, stooping, kneeling, crouching, climbing of ramps or stairs, and no crawling or climbing of ladders, ropes or scaffolds.

(R. at 16.) Mr. McCullough's report contradicts this finding and corroborates Plaintiff's testimony regarding his limitations. Accordingly, it creates a conflict and calls into question the ALJ's decision regarding Plaintiff's pain disorder and his RFC.

Even so, the undersigned must consider whether this report should be considered because Mr. McCullough did not evaluate Plaintiff until approximately three months after the ALJ's decision.

29

While his report clearly postdates the ALJ's decision, "Wilkins does not impose a bright line test based on the date of the test akin to a statute of limitations." Camper v. Barnhart, No. 7:04 CV 00403, 2005 WL 1995446, at *7 (W.D. Va. Aug. 16, 2005), amended 2005 WL 2105025 (W.D. Va. Aug. 29, 2005); see also Boggs v. Astrue, No. 2:12-cv-25, 2012 WL 5494566, at *5 (N.D. W. Va. Nov. 13, 2012) (applying Camper to determine that a test completed over three months after the ALJ's decision related "to the period of time the ALJ evaluated"). Rather, the issue becomes whether the new and material evidence "relat[es] to the period on or before the date of the ALJ decision." Wilkins, 953 F.2d at 95. The relation between Mr. McCullough's August 16, 2012 report and the period before the ALJ's decision is clear in this case. Plaintiff's complaints of problems with pain and problems interacting with others have been alleged starting in at least 2011, and the treatment record repeatedly indicates these issues. Furthermore, Dr. Scharf diagnosed Plaintiff with a pain syndrome in 2011 (R. at 335), and Mr. McCullough's report confirms the opinions of Plaintiff's prior providers and further opines on Plaintiff's limitations arising from his various impairments, including his pain disorder. There is no mention in Mr. McCullough's report or by either party that there have been any recent changes to Plaintiff's conditions. Given the short period of time between the ALJ's decision and Mr. McCullough's August 16, 2012 report, it is clear that the Commissioner needs to fully evaluate this evidence. Accordingly, the undersigned recommends that Plaintiff's case be remanded to the Commissioner to weigh and resolve the evidence reflected in Mr. McCullough's report.

### C. Nurse Practitioner

Plaintiff also asserts that the ALJ erred by discounting NP Williams' opinion by classifying her as a non-acceptable medical source. (Plaintiff's Brief at 10.) According to Plaintiff, NP

Williams "is an acceptable source for showing the severity of [his] impairments." (Id. at 11.) It is undisputed that NP Williams is a Nurse Practitioner.[2]

As to NP Williams' opinion, the ALJ wrote:

A Medical Source Statement (Mental) was completed by nurse Williams, United Summit Center, on April 18, 2012 (Exhibit 18F). Ms. Williams opined that the claimant has severe limitations in his ability to travel in unfamiliar places or use public transportation because he is likely to get angry or frustrated; moderately severe limitations in his ability to understand and remember detailed instructions; complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without any unreasonable number and length of rest periods; moderate to moderately severe limitations in his ability to perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances, accept instructions and respond appropriately to criticism from supervision (because he is easily agitated by other people); moderate limitations in his ability to carry out very short and simple instructions, carry out detailed instructions, maintain attention and concentration for extended periods of time, respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions, set realistic goals or make plans independently of others; and mild to moderate limitations in his ability to work in coordination with or proximity to others without being distracted by them. All other work-related limitations were opined to be mild. Ms. Williams notes that the claimant has been "treated and evaluated by several mental health provers" (the medical evidence of record shows only three), and all agree he has anxiety disorder and depression (Exhibit 18F). The undersigned notes that there is a very large discrepancy between the GAF of 39 opined by Dr. Scharf for the period September 29, 2011 through November 19, 2011 (Exhibit 11F), and the GAF of 55 expressed by United Summit Center on October 6, 2011, and continuing (Exhibit 14F).

. . .

Less weight is given to the opinion expressed at Exhibit 18F. The opinion is not consistent with United Summit Center records, or the longitudinal medical evidence of record. Further, the source is not an appropriate medical source.

(R. at 24.)

20 C.F.R. §§ 404.1513 and 416.913 establish what sources can provide evidence to establish

---

[2]The Commissioner did not address Plaintiff's argument regarding NP Williams in her brief.

an impairment. Those sections read:

(a) *Sources who can provide evidence to establish an impairment.* We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s). . . . Acceptable medical sources are-
  (1) Licensed physicians (medical or osteopathic doctors);
  (2) Licensed or certified psychologists. . . .;
  (3) Licensed optometrists . . .;
  (4) Licensed podiatrists . . .;
  (5) Qualified speech-language pathologists . . . .

(d) *Other sources.* In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to-
  (1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
  (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
  (3) Public and private social welfare agency personnel; and
  (4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2) further state:

Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Nothing in these regulations requires an ALJ to consider the opinion of a nurse practitioner.

The Fourth Circuit has noted that those other than "an 'acceptable medical source'" do "not qualify"

"to make a 'medical assessment' on a Social Security claimant's 'ability to do work-related activities

such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking and

traveling." Lee v. Sullivan, 945 F.2d 687, 691 (4th Cir. 1991) (citing 20 C.F.R. § 416.913).

Assessments completed by those who are not acceptable medical sources "can qualify only as a

layman's opinion." Id.

Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 (Aug. 9, 2006) also provides that a nurse practitioner, while a "medical source," is not an "acceptable medical source." Id. at *2. SSR 06-03p states:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. . . . Second, only "acceptable medical sources" can give us medical opinions. . . . Third, only "acceptable medical sources" can be considered treating sources . . . whose medical opinions may be entitled to controlling weight.

Id. It further notes that:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Id. at *3. Accordingly, information from "other sources," such as nurse practitioners, "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. at *2.

The undersigned has previously found that an ALJ does not err by referring to a nurse practitioner as "not an appropriate medical source." See, e.g., Wilmoth v. Astrue, No. 1:11CV129, 2012 WL 6901204, at *32 (N.D. W. Va. Dec. 18, 2012); Conard v. Barnhart, Civil Action No. 2:06-cv-4, Docket No. 15 at 21-22) (Report and Recommendation/Opinion of Kaull, Mag. J., filed Nov. 6, 2006). Here, then, the undersigned finds that ALJ Cusick did not err by classifying NP Williams

as "not an appropriate medical source." (R. at 24.)

As noted above, the ALJ also assigned less weight to NP Williams' opinion because her opinion was "not consistent with United Summit Center records, or the longitudinal evidence of record." (R. at 24.) However, the undersigned has already found that the Appeals Council erred by not remanding Plaintiff's case to the ALJ for consideration of Mr. McCullough's August 16, 2012 report. Having determined that, it follows that substantial evidence does not support the ALJ's determination that NP Williams' opinion was inconsistent with the record as a whole.

## V. CONCLUSION

Upon consideration of all the above, the undersigned United States Magistrate Judge finds and concludes that substantial evidence does not support the ALJ's determination that Plaintiff was not disabled during the relevant time period, and recommends that the case be reversed and remanded for the Commissioner to take into consideration Rod McCullough, MA's August 16, 2012 report concerning his consultative examination of Plaintiff. The undersigned also finds and concludes that given the need for the Commissioner to take Mr. McCullough's report into consideration, substantial evidence does not support the ALJ's decision to assign less weight to NP Williams' opinion for the reason that it was "not consistent with United Summit Center records, or the longitudinal medical evidence of record." (R. at 24.)

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED**, and the Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** and this action be **REMANDED** to the

Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _5_ day of _May_ , 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE